UNITED STATES BANKRUPTCY COURT
NORTHERN DISTRICT OF ILLINOIS
WESTERN DIVISION

| | | |
|---|---|---|
| In re: | ) | Bankruptcy No.  22-80370 |
| Shane S. Siner, | ) | |
| Debtor. | ) | Chapter 13 |
| | ) | |
| | ) | Judge Lynch |
| | ) | |

## MEMORANDUM OPINION

Before the court is the objection raised by the Debtor, Shane S. Siner, to the priority status for alleged domestic support obligations claimed by Melinda Siner based on the parties' Marital Settlement Agreement.  Ultimately, the amount of Melinda's claim is not in dispute.[1]  Rather, the Debtor argues that the claim is not entitled to priority status because the debt asserted is not in the nature of support. For the reasons discussed below, the court finds that the contested obligations are not a "domestic support obligation" for purposes of priority treatment and, therefore, will sustain the Debtor's objection.

## JURISDICTION AND PROCEDURAL BACKGROUND

The allowance or disallowance of claims against the bankruptcy estate is a core proceeding. 28 U.S.C. § 157(b)(2)(B).  *See In re Rowell*, 606 B.R. 329, 333 (Bankr. N.D. Ill. 2019).  The claims-allowance process, at least with respect to filed proofs of claim,

---

[1] The Debtor's original written objection to claim contended that the claim should only be allowed in the amount of $47,580 rather than the $52,900 asserted in the proof of claim.  However, at trial he no longer pressed that argument and instead testified with no dispute or clarification that he himself had scheduled the debt as an unsecured claim for $52,900.  The court finds the argument to have been abandoned, and in any event unsupported, given Bankruptcy Rule 3001(f)'s direction that a properly filed proof of claim constitutes prima facie evidence of the validity and amount of a claim. Fed. R. Bankr. P. 3001(f).

arises under the Bankruptcy Code and is "subject to resolution by the bankruptcy court." *Stern v. Marshall*, 564 U.S. 462, 497 (2011) (citing *Langenkamp v. Culp*, 498 U.S. 42, 45 (1990)). Additionally, at the hearing on December 13, 2022, counsel for both the Debtor and Melinda consented on the record to this court entering final orders in the matter.

Melinda timely filed her proof of claim for $52,900 for amounts owing under the Marital Settlement Agreement. (Claim No. 6-1.) The court conducted an evidentiary hearing on the Debtor's objection on December 13, 2022, at which Shane and Melinda testified and only one exhibit, a copy of the Siners' Judgment of Dissolution of Marriage and Marital Settlement Agreement, was offered. Although the attorney for the chapter 13 Trustee participated in the examination of the witnesses, the Trustee took no position on the objection. The court heard closing statements on December 27, 2022. For its decision, the court also takes judicial notice of its own docket. *See, e.g., Levine v. Egidi*, No. 93 C 188, 1993 WL 69146, at *2 (N.D. Ill. Mar. 8, 1993).

After careful review of the testimony and credibility of the witnesses and their exhibit, and giving due consideration to the argument of counsel in their written submission and at oral argument, the court finds the amounts claimed by Melinda to be obligations for the parties' agreed upon division of property in their divorce proceedings, and not in the nature of alimony, maintenance, or support.

## FINDINGS OF FACT[2]

Shane and Melinda were married on November 1, 2011.  They have one child.  Shane holds an associate's degree and Melinda has obtained a high school equivalency certificate.  During their marriage, Shane worked first at a credit union and then at a bank, earning approximately $32,000 per year.  Melinda worked at a clothing store before she married Shane.  During their marriage she was the primary caregiver for their child.  Melinda testified that the Debtor "did not encourage her to work outside the house" and at first Melinda did not.  However, after their child started school in or around 2016, Melinda took a weekend job at a pub.  Melinda testified that at the time she did not earn enough to support herself.  She does not own a car or hold a driver's license.

It is not disputed that the couple separated in 2018.  Melinda moved out of the marital home located in Machesney Park, Illinois, to live first with her brother and later with her parents.[3]   In 2019, Shane found work at Quest Global paying approximately $50,000 per year.  A year later he was hired by Collins Aerospace where he remains employed.

Nor is it disputed that in 2018 Shane filed a petition for dissolution of the marriage in the Seventeenth Judicial Circuit Court (Winnebago County, Illinois).  In

---

[2] The following findings, together with those set out in the "Discussion" below, set forth the court's findings of fact and conclusions of law as required by Fed. R. Civ. P. 52(a) and Fed. R. Bankr. P. 7052. To the extent any findings of fact constitute conclusions of law, they are adopted as such, and to the extent that any conclusions of law constitute findings of fact, they are adopted as such.

[3] The record is not clear where their child resided between the initiation of the divorce proceeding and the issuance of the divorce decree, though it is undisputed that after entry of the Marital Settlement Agreement and divorce decree Shane and Melinda split custody equally.

the resulting divorce proceedings, Shane and Melinda each were represented by counsel. The Marital Settlement Agreement reflects that during the divorce proceedings, it was disclosed that Shane anticipated his 2022 income would be about $75,000. During this time, Melinda was unemployed and without regular outside income. On February 10, 2022, the state court entered its judgment for dissolution of marriage (the "Divorce Decree"). The Divorce Decree attached and incorporated a marital settlement agreement (the "MSA") Shane and Melinda had entered into.[4]

**The Marital Settlement Agreement.** Shane testified that he and Melinda signed the MSA a few days before the court entered the judgment for dissolution. Melinda did not dispute this. The parties presented little testimony about the negotiation and execution of the agreement beyond the fact that each was represented by their own attorney. The document indicates that Shane's attorney prepared the instrument. Melinda acknowledged at trial that she read the MSA before signing it and had the aid of her counsel during the negotiation of its terms.

The Divorce Decree entered by the state court attaches the MSA and states that it adopts the agreement "with the same force and effect as if said provisions were . . . set forth verbatim as the judgment of" the divorce court. The Divorce Decree expressly provides that Shane and Melinda each "waives maintenance and is forever barred from receiving maintenance" from the other.

---

[4] The copy of the Marital Settlement Agreement submitted to this court is unsigned and undated. However, the parties do not dispute that it accurately represents the terms of the agreement they reached in the divorce proceedings.

Article III of the MSA is titled "Maintenance." This provision states that Shane and Melinda waive maintenance, agreeing that each "is forever barred from collecting maintenance" from the other. The article further states that Shane and Melinda each "acknowledges that he or she is fully informed of his or her respective rights and obligations under Illinois law and pursuant to the terms and provisions of" the MSA. It then acknowledges that each party represents and warrants that they have "carefully reviewed the terms and provisions of [the MSA] and has a full and complete understanding of the legal consequences thereof."[5]

Article IV of the MSA addresses "Support of the Minor Child and Related Matters." This provision requires Shane to pay Melinda $550 per month beginning with the entry of the Divorce Decree and continuing until the child graduates high school, turns 18 (or 19 if still attending high school), or the occurrence of other "emancipation events." Article IV states that this monthly payment "represents the current statutory guidelines amount based upon Husband's approximate annual gross income of $75,000 per year, and Wife's approximate annual gross income of $0 per year." In Articles IV through VII, the MSA evenly apportions various child-related expenses, including medical and educational expenses, and equally splits between the parties as well as the right of each to claim child tax stimulus payments.

---

[5] The MSA states that the parties entered into the agreement "freely and voluntarily, without imposition of force, duress, coercion or undue influence from any source." It goes on to represent for each party that the "other party has made no representations or warranties as an inducement to enter into [the MSA], other than as set forth in writing within the terms and provisions of [the MSA,]" and that the terms and provisions of the MSA "are fair and equitable to each of the parties in light of the respective and collective circumstances of the parties." In the Divorce Decree, the state court expressly found that the MSA was "entered into freely and voluntarily between the [parties, is] not unconscionable, and ought to receive the approval" of the divorce court.

Melinda testified that she and Shane share custody on a 50/50 basis.[6]  She further testified that the Debtor is current on his child support obligations and acknowledged that her proof of claim is not based on his child support obligations.

It is undisputed that Melinda rests her proof of claim on Article IX of the MSA. Entitled "Property Settlement," Article IX permits Shane and Melinda to each retain certain bank accounts and personal property not at issue.  Melinda directs the court to three subsections in the article, entitled "Marital Residence," "Automobiles," and "Retirement Account," in support of her claim.  After describing the parties' marital residence, the first subsection in Article IX states:

> HUSBAND shall be awarded the marital residence upon payment to WIFE of $26,250.00 ("AGREED HOUSE PAYMENT") made payable to WIFE and sent to her counsel and shall be responsible for all sums due and owing including the mortgage payment, any liens, real estate taxes and utilities and shall hold WIFE harmless and indemnified thereon. WIFE shall quitclaim her interest in said property upon receipt of the AGREED PAYMENT within 60 days of entry of Judgment of Dissolution.  Should HUSBAND not pay WIFE the AGREED HOUSE PAYMENT within (60) days of the Judgement of Dissolution, the RESIDENCE shall be promptly listed for sale at a price to promptly sell the RESIDENCE and WIFE shall be entitled to receive all proceeds from the RESIDENCE up to the AGREED HOUSE PAYMENT amount prior to HUSBAND receiving any proceeds from the sale.  Should there be a deficiency in the sale of payment of the AGREED HOUSE PAYMENT to WIFE, HUSBAND shall remain personally liable for any deficiency.

It is undisputed that Shane did not make the agreed payment and the marital residence has not been sold.  Instead, Shane commenced this chapter 13 bankruptcy case before the 60-day deadline passed.  Melinda does not claim that she has paid or

---

[6] The Divorce Decree references and incorporates a parenting plan designated as "Exhibit B," which was not attached to the copy of the Divorce Decree submitted to and received by this court at trial. Neither party raised concern about the absence of the referenced Exhibit B from the sole exhibit presented to this court.

was held liable for any mortgage, tax or utility payment relating to the marital residence. The parties have raised no dispute, and the court makes no finding, about the status of title to the property or whether Melinda has any ownership or security interest in the residence.

Melinda next directs the court to Article IX's fourth subsection which concerns a 2008 Mercedes in Shane's possession. This provision states:

> HUSBAND shall be awarded the MERCEDES upon payment to WIFE of $400.00 ("AGREED MERCEDES PAYMENT") made payable to WIFE and sent to her counsel and shall be responsible for all sums due and owing related to said MERCEDES and shall hold WIFE harmless and indemnified thereon. WIFE shall release her interest in said property upon receipt of the AGREED MERCEDES PAYMENT within 60 days of entry of Judgment of Dissolution. Should HUSBAND not pay WIFE the AGREED MERCEDES PAYMENT within (60) days of the Judgement of Dissolution, the MERCEDES shall be promptly listed for sale at a price to promptly sell the MERCEDES and WIFE shall be entitled to receive all proceeds from the MERCEDES up to the AGREED MERCEDES PAYMENT amount prior to HUSBAND receiving any proceeds from the sale. Should there be a deficiency in the sale of payment of the AGREED MERCEDES PAYMENT to WIFE, HUSBAND shall remain personally liable for any deficiency.

Similar to the controversy regarding the provision for the marital residence, there is no dispute that Shane did not make the "Mercedes Payment" to Melinda or arrange for its sale as required. Although Shane testified that he no longer possesses the 2008 Mercedes, he was not questioned about its disposition or last known location or status. Here, too, Melinda does not assert that she has been held responsible for any liability related to the vehicle. As is the case for the marital residence, such issues relating to the vehicle have not been raised and the court makes no finding as to the

effectiveness of any transfer or whether Melinda possesses any ownership or security interest in the car.

Finally, the third subsection at issue describes a certain retirement account Shane has by "virtue of [his] employment." This provision states:

> WIFE shall be awarded $20,930.00 ("AGREED RETIREMENT PAYMENT") of said Retirement Account as of the date of entry of Judgment for Dissolution by means of a Qualified Domestic Relations Order to be prepared by WIFE's attorney. Should there be a deficiency in the AGREED RETIREMENT PAYMENT to WIFE, HUSBAND shall remain personally liable for any deficiency.

Shane and Melinda each claim to be unaware of any separate order transferring an interest in the "Retirement Account." Shane testified without contravention that he made no withdrawals from the account following the entry of the Divorce Decree. Like for the residence and Mercedes, no issue has been raised or evidence presented as to the effectiveness of any withdrawal or transfer from the retirement account or whether Melinda has any ownership or security interest in it. Again, the court makes no determination on such issues.

Shane testified that the payment amounts were intended to reflect 50% of the equity in the property described. He testified that the Mercedes was valued at $800 based on the Blue Book value minus necessary repairs, essentially a "scrap value" as he put it. He testified the value for the home to be a negotiated amount that was somewhat greater than the appraisal value Melinda had obtained and less than a market analysis figure Shane had obtained, taking into consideration a mortgage balance of approximately $148,000. Neither party submitted to this court any appraisals or other evidence of value, but Melinda did not dispute or contradict

Shane's testimony.   The court makes no finding at this time as to the residence's actual value for other purposes but accepts Shane's testimony that the $26,250 payment obligation was intended to estimate 50% of the equity interest in the residence.

**The Debtor's chapter 13 bankruptcy.**   The testimony reveals that Shane's bankruptcy petition could not have come as a complete surprise to Melinda, even if she was not necessarily aware of its full consequences.   Shane testified that he met with and retained a bankruptcy attorney about a potential bankruptcy filing before the divorce, in 2017 or 2018.[7]   He further testified that, on advice of either his bankruptcy counsel or his divorce counsel, he decided to wait to file bankruptcy until after the divorce was finalized.   The evidence shows that Melinda was present with Shane at an initial meeting with the bankruptcy attorney in 2018 to discuss bankruptcy.   It is undisputed that Melinda never retained that attorney to represent her.   Shane claimed that before the divorce he had asked Melinda to jointly file bankruptcy with him, but she refused.   Melinda could not recall if she told him that she did not want to file bankruptcy.   She stated that she did not sign a retainer, provide any funds for a retainer, or attend any other meetings with Shane's bankruptcy counsel.   Nor did she independently seek bankruptcy counsel before Shane commenced this bankruptcy case.

The court notes that the general provisions of the MSA recite the parties' acknowledgement that "bankruptcy laws can significantly affect parties [sic] rights

---

[7] That attorney was not the same person the Debtor ultimately retained to file his petition in 2022.

related to dissolutions of marriage." (Ex. A, Article XIV, ¶ 9.)  This provision goes on to state that the attorneys of record in the Siners' divorce proceedings "do not hold themselves out as being experts in tax or bankruptcy related matters, and therefore, have recommended that the parties obtain competent tax and bankruptcy advice from independent sources." (*Id.*)

Shane filed his chapter 13 petition on April 6, 2022.  He has proposed a plan to pay the chapter 13 Trustee $200 per month for 36 months, listing as the only anticipated priority claims $3,500 for attorney's fees and $720 in trustee's fees.  His proposed plan provides for a total payment of $2,980 to general unsecured creditors. In addition to Melinda, they are:  the mortgage bank which filed a secured claim for $146,226.99, a servicer on behalf of the Department of Education which filed an unsecured claim for a student loan of $14,049.66, and four other creditors which filed general unsecured claims totaling $12,814.74.  The Debtor's proposed plan provides that he will pay the mortgage on the Machesney Park residence and certain student loans directly and outside the plan.

Melinda, through counsel, filed her proof of claim on June 9, 2022. (Claim No. 6-1.)  It lists the amount of her claim to be $52,900 and describes the basis of the claim to be a "Marital Settlement Agreement."  Attached to the proof of claim is an unsigned copy of the MSA.[8]  Her proof of claim checks the box to designate the $52,900 claimed as entitled to priority as "Domestic support obligations (including alimony

---

[8] The Divorce Decree is not attached to the proof of claim.  Also, unlike the version of the MSA submitted into evidence at trial, the proof of claim version has the day "10" and month "Feb" handwritten on the first page of the agreement.

and child support) under 11 U.S.C. § 507(a)(1)(A) or (a)(1)(B)." She selected "No" where asked whether all or part of the claim is secured, but then completed the portion of the claim form pertinent to collateral for secured debt, describing the "Nature of property" as "Interest in Marital Real Estate." Melinda's proof of claim goes on to list the amount of the claim that is secured as "$0.00," and the amount of claim that is unsecured as $52,900. It further lists the amount necessary to cure any default as of the date of the petition as "$26,500.00."

Neither party raises as an issue or offers any evidence as to whether or not Melinda's claim is secured. Nor has either party requested a determination as to ownership or security interest in any property related to the claim. And here, too, the court will make no determination at this time as to said issues, except to whether or not the property interest asserted in her claim was intended to be a division of marital property or in the nature of alimony, maintenance, or support.[9]

## DISCUSSION

Generally, "one who asserts a claim is entitled to the burden of proof that normally comes with it." *Raleigh v. Ill. Dep't of Rev.*, 530 U.S. 15, 21 (2000). Federal Rule of Bankruptcy Procedure 3001(f) provides that a "proof of claim executed and filed in accordance with these rules shall constitute prima facie evidence of the validity and amount of the claim," but does not otherwise shift the ultimate burden of proof. *See Raleigh*, 530 U.S. at 22 n.2. Moreover, Rule 3001(f) only applies to the

---

[9] Similarly, the matter is before the court solely on the objection to claim and the priority status of such claim. The court makes no findings at this time as to the confirmability of the Debtor's proposed plan, including whether the plan has been proposed in good faith or that the action of the debtor in filing the petition was in good faith. 11 U.S.C. § 1325.

validity and amount of the claim and does not provide "the same evidentiary presumption of asserted priority." *In re Alewelt*, 520 B.R. 704, 710 (Bankr. C.D. Ill. 2014)); *see also, e.g., In re Harris*, 2022 Bankr. LEXIS 2590 (Bankr. E.D. Wis. Sept. 22, 2022) (explaining that Rule 3001(f) does not apply and "claimant has the burden of proving by a preponderance of the evidence that its claim is entitled to priority status").

Melinda relies upon section 507(a) of the Bankruptcy Code to assert her claim is entitled to priority treatment. If the claim is in the nature of maintenance or support it will receive priority status: "Allowed unsecured claims for domestic support obligations that, as of the date of the filing of the petition . . . are owed to or recoverable by a spouse, former spouse, or child of the debtor, or such child's parent, legal guardian, or responsible relative . . . ." 11 U.S.C. § 507(a). The Bankruptcy Code defines "domestic support obligation" to mean, in pertinent part, a debt "in the nature of alimony, maintenance, or support (including assistance provided by a governmental unit) [to a] spouse, former spouse, or child of the debtor or such child's parent, without regard to whether such debt is expressly so designated." *Id.* § 101(14A)(B).

Courts have turned to precedent interpreting section 523(a)(5)'s provision for the exception of domestic support obligations in construing section 507(a). *In re Pearce,* 245 B.R. 578, 582-83 (Bankr. S.D. Ill. 2000) ("Given the similarity of language and purpose of § 507(a)(7) and § 523(a)(5), the definition of 'support' developed under § 523(a)(5) . . . constitutes guiding precedent in construing § 507(a)(7)."). In *Kolodziej*

*v. Reines (In re Reines),* the Seventh Circuit addressed whether a debt is "in the nature of alimony, maintenance, or support" in the context of section 523(a)(5). 142 F.3d 970, 972 (7th Cir. 1998).[10] Noting that "whether or not the debt is a maintenance obligation is a matter of federal bankruptcy, rather than state, law," the court emphasized that it was "not bound by the labels attached to the obligation." *Id.* Instead, it is the parties' intent that controls whether an obligation is in the nature of alimony, maintenance, or support or rather is in the nature of a property settlement. *Id.* at 973.

Such intent often is not readily apparent. In *Reines*, because there was "no clear intent *expressed* to treat the debt as maintenance in the settlement papers," the court had to "look to other factors to try and figure out what the parties had in mind," observing with some skepticism that courts had devised various "elaborate" tests and lists of factors to use. *Id.*

The Seventh Circuit has indicated that where "there is no settlement agreement between the parties at issue," the court instead looks to "the intent of the state court in rendering its judgment," analyzing "(1) the language and substance of [the] judgment in the context of the surrounding circumstances, using extrinsic evidence if necessary; (2) the parties' financial circumstances at the time of the judgment; and (3) the function served by an obligation at the time of the judgment."

---

[10] Although the 2005 amendments to the Bankruptcy Code restructured several provisions related to domestic support obligation, creating a single term "domestic support obligation" defined in section 101 and used in both section 507 on priorities and section 523 on non-dischargeability, the "2005 BAPCPA amendments 'did not change the standard for whether a debt or obligation is in the nature of support.'" *Halbert v. Dimas (In re Halbert)*, 576 B.R. 586, 592 (Bankr. N.D. Ill. 2017) (quoting *Rivera v. Orange Cty. Prob. Dep't (In re Rivera)*, 832 F.3d 1103, 1111 (9th Cir. 2016)).

*Trentadue v. Gay (In re Trentadue)*, 837 F.3d 743, 749 (7th Cir. 2016).  At issue in

*Trentadue* was a dispute over whether the divorce court's award of attorney's fees for

"overtrial" was a punitive sanction or a domestic support obligation.  In this case,

however, the MSA provides strong evidence of the parties' intent and nothing in the

Divorce Decree suggests that the obligation is in the nature of alimony, maintenance,

or support.  The Divorce Decree "adopt[s]" the MSA "as if said provisions were . . . set

forth verbatim as the judgment of this Court," and decrees that each party "waives

maintenance and is forever barred from receiving maintenance" from the other.

(Ex. A.)  The Divorce Decree further finds that the MSA was "entered into freely and

voluntarily between the parties [and is] not unconscionable, and ought to receive the

approval of this Court." (*Id.*)  Here not only is there a clear intent expressed in the

settlement papers to treat the debt as a division of property, but other largely

undisputed facts further show that was the intent of the parties at the time they

agreed to the MSA and when the Divorce Decree was entered.

First, the labels used for the obligation and position within the agreement

unequivocally describe the obligation as a division of property.  The entire claim

asserted in the proof of claim relates to obligations described in Article IX of the MSA,

an article titled "Property Settlement."  Support and maintenance are treated in

separate articles.  In Article III, "Maintenance," Melinda "waives maintenance

(formerly known as alimony) and agrees that by said waiver of maintenance, she is

forever barred from collecting maintenance, now or in the future." (Ex. A.)  Child

support, consisting of monthly payments, together with sharing of certain categories

of child support expenses until emancipation are provided for in separate sections of the MSA and denoted as such.

More than merely labeling the obligations as property division, Article IX specifically describes the nature and value of the property being divided. It describes the lump sum obligation of $26,250 to Melinda as the "AGREED HOUSE PAYMENT" upon payment of which Shane will be "awarded" the Machesney Park residence. Similarly, it states that Shane will be awarded the 2008 Mercedes upon payment to Melinda of the $400 "AGREED MERCEDES PAYMENT." Both payments were due within 60 days of entry of the Divorce Decree. If not paid, Article IX states that the house and Mercedes would "be promptly listed for sale" with Melinda to receive the specified amounts from the proceeds. Article IX also "awarded" Melinda $20,930 of Shane's retirement account. Described as the "AGREED RETIREMENT PAYMENT," that amount is to be transferred to her "by means of a Qualified Domestic Relations Order to be prepared by WIFES's attorney." (Ex. A)

Article IX does not refer to the parties' relative finances, expenses or earning potential, in marked contrast to Article IV, titled "Support of the Minor Child and Related Matters." Article IV discusses Shane and Melinda's estimated annual gross income in connection with setting $550 to be the monthly child support to be paid by Shane until their child becomes an adult or is otherwise emancipated. Custody is to be shared equally and other child-related expenses and child tax stimulus payments are to be split "on a 50/50 basis." Melinda acknowledged in her testimony that none

of her claim is for child-support obligations, and that the Debtor is current on these amounts as of the petition date and the date of trial.

Counsel for Melinda argues that the total monetary obligation of the Debtor under the terms of the MSA is "remarkably similar" to what a divorce court would have awarded as maintenance under statutory guidelines.  From this, he contends, the court should infer that it was intended as maintenance.  He presented no case law in support of this.  Under the applicable statute, a divorce court "shall first make a finding as to whether a maintenance award is appropriate," considering a non-exhaustive list of factors set forth in the statute. 750 ILCS 5/504(a).  "Only if the court finds that a maintenance award is appropriate, the court shall order guideline maintenance [or] non-guideline maintenance" as is appropriate. 750 ILCS 5/504(b-1).

Under the statute, guideline maintenance is "calculated by taking 33 1/3% of the payor's net annual income minus 25% of the payee's net annual income," and for a marriage lasting 9 to 10 years (at the time the divorce action was commenced) the duration of maintenance would be calculated by multiplying the length of the marriage by 40. (*Id.*)  At trial, Melinda testified generally that at the time the divorce proceeding commenced she had "no income."  In the section discussing child support, the MSA estimates Shane's approximate annual gross income, but says nothing of his net income.  No testimony was offered at trial as to Shane's actual gross or net income at that time.  While counsel did not present his calculations at trial, Melinda's initial written response to the Debtor's objection proposes a guideline figure of $56,423.52 based on the Debtor's schedule I filed with his bankruptcy petition.  This, counsel

contends, is "close" to the total lump sum payments of $47,580 that became due 60 days after entry of the divorce decree under Article IX.

This argument appears on its face to mix apples and oranges. But even were the court to accept counsel's argument, it has not been been shown that either Melinda or the divorce court considered this in connection with Article IX. To the contrary, Shane testified credibly that the calculation of the "Agreed House Payment" was based not on income but on the equity in the residence. It was a negotiated amount between the figures suggested by the two competing appraisals of the home. Similarly, Shane testified that the "Agreed Mercedes Payment" and the "Agreed Retirement Payment" were based on an even division of the value of those assets. Melinda did not disagree. She offered no contrary testimony or other evidence to show that income was discussed or considered by the parties or the court to set the amount to be paid under Article IX of the MSA in connection with the marital residence, the car and the retirement account.

Rather than support the claim that these payments are in the nature of maintenance, counsel's reference to the statute highlights that the Article IX obligations are unlike maintenance. The statute requires that in "each case involving the issue of maintenance, the court shall make specific findings of fact" and "shall state its reasoning for awarding or not awarding maintenance." 750 ILCS 5/504(b-2). Rather than find Melinda entitled to maintenance, however, the state court's Divorce Decree states that the MSA was "entered into freely and voluntarily between the parties" and was "not unconscionable." It then goes on to decree that Melinda "waives

maintenance and is forever barred from receiving maintenance." Further, as the guidelines in the statute indicate, maintenance is generally an ongoing obligation, either for a fixed or indefinite term, and not normally paid in a lump sum, which is more often a hallmark of a property division. Under the statute, with certain exceptions, "the obligation to pay future maintenance is terminated upon the death of either party, or the remarriage of the party receiving maintenance, or if the party receiving maintenance cohabits with another person on a resident, continuing conjugal basis." 750 ILCS 5/504(c); *see also Reines*, 142 F.3d at 973 (finding fact that the obligation did not end upon marriage to be a significant factor weighing against argument that in the nature of maintenance).

Recognizing that labels are not dispositive and the issue of priority is one of federal bankruptcy law, courts have under some circumstances found an obligation designated as a property settlement to be in the nature of support. It is often difficult to completely separate property division from support, for a "spouse who is given more property usually needs less support and vice-versa." 1 Collier Family Law and the Bankruptcy Code P 6.04 (2022). At trial, however, Melinda failed to demonstrate that the payments for the residence, vehicle, and retirement funds were intended to be maintenance and not a property distribution. Melinda shared how she could have used the money for her education and to buy a car. But she failed to explain or link their necessity or purpose to the intentions of the parties at the time, offering instead only vague suggestions as to how she would use the money now.

This is not to say that an intended use for college expenses or a vehicle could not have been in the nature of support.  But here the scant evidence offered at trial does not overcome the weight of the uncontroverted evidence that includes the unequivocal terms of the parties' MSA and the Divorce Decree, and Melinda's own testimony about her understanding of the agreement she signed.  Represented by her own legal counsel both during the divorce proceedings and in this bankruptcy matter, she testified that she had read and understood the MSA at the time she signed it and that she understood that in doing so she waived maintenance.  She did not testify that she was misled or that she failed to understand the agreement or the decree.

In responding to the Debtor's objection to claim, Melinda pointed out that Shane filed his bankruptcy petition 55 days after the parties signed the MSA and days before Article IX's deadline for the payments for the marital residence, the vehicle and the retirement account.  From this she argues that "it is clear from the timing of the Debtor's bankruptcy that he never intended to perform the terms of the Marital Settlement Agreement." (ECF No. 31.)  Melinda's counsel repeated this at closing argument but was unable to fully explain how this is relevant to the pending claim and the issue presented of whether the MSA Article IX obligations are in the nature of support or maintenance.

The dischargeability of the debt, and particularly a challenge to dischargeability on the basis of misrepresentation, is not now before the court.[11]

---

[11] Notably, priority for a claim primarily affects other *creditors*, who are generally forced to wait for any remaining distribution until after priority claims are paid.  In contrast, non-dischargeability primarily affects the debtor post-petition.  While Congress chose to make both fraud claims and

Likewise, while the confirmation of the Debtor's chapter 13 plan may involve issues of intent, including whether the petition and the plan were filed in good faith, such matters are not now before the court. Accordingly, the court does not make any findings on such issues in this decision.

Melinda has not challenged the effectiveness or enforceability of the MSA or the Divorce Decree. She has not alleged or shown that either her understanding or the divorce court's understanding of the agreement was induced by fraud or misrepresentation. She does not allege, let alone demonstrate, that the Debtor induced her not to read the MSA or misled the divorce court. To be sure, the evidence of his actions around the filing of his bankruptcy petition affects his credibility as a witness, and the court has taken due account of that. While some supporting evidence was from Shane's testimony, such as the fact the negotiation over the amount of the obligation was based on competing appraisals of the marital home, Melinda offered no evidence to contradict that testimony, despite being a party to that negotiation. The weight of the evidence that the court has relied on to find the payment obligations for the marital residence, the vehicle and the retirement account under Article IX to be in the nature of a property settlement comes from the undisputed documents themselves and from Melinda's own testimony.

## CONCLUSION

The court therefore finds that the Debtor's monetary obligations claimed by Melinda Siner are not in the nature of alimony, maintenance, or support.

---

domestic support obligations non-dischargeable, 11 U.S.C. § 523(a)(2), (5), it gave priority status only to domestic support obligations. 11 U.S.C. § 507.

Accordingly, the Debtor's objection will be sustained, and Claim 6-1 will be allowed solely as a general unsecured claim.

A separate judgment will be entered pursuant to Bankruptcy Rule 7058 giving effect to the determinations reached herein.

DATE: March 31, 2023

ENTER:

_____
Thomas M. Lynch
United States Bankruptcy Judge